I have to make notes at the top to distinguish these cases. Okay, I'm all set. Good morning, may it please the Court. My name is Rob Henig. I am here on behalf of Objector, Parvin Gassemian. I first wanted to address the issue that required such a little briefing, the issue of standing. I think the Court would like that. And I would like to say that there are two issues that have been brought up as to the issue of standing from the defendant and then also from the plaintiffs. The first issue from the plaintiffs was this idea or concept that Ms. Gassemian released her claims. And as we noted in our supplemental brief, the actual case of Kimberley Reins allows parties to contract, to specifically not include the claims at issue, so that the dismissal with prejudice did not involve any of the class claims that are at issue in this appeal. So therefore, we do have standing pursuant to that. The defendant, CVS, also raises a separate issue. And basically, CVS is asking you to overturn a very bright-line rule in the Churchill Village case, which says specifically that objectors or non-participating class members have standing. So it would ask you to reject the exception that they're seeking to do of a bright-line rule that's been established by this Court for the past 18 years. And I think that should answer the issue of standing. Unless there are questions. Yes, I guess my problem is that the carve-out, the settlement between the parties, was not presented to the district court in that case, right? The district court? The Gassemian case. The Gassemian case. I'm sorry. Yes, yes. Parvin, Gassemian is our plaintiff. You mean in the Superior Court in Orange County? That's correct. How are we supposed to know what was actually settled in that? Well, we did include the language specific to the carve-out. And the carve-out could not be clearer. I agree. But I guess the question is that was not presented to the district court as far as the district court's order. Sorry, the sub-Superior Court's order is that all the claims are settled and nothing further. No. Well, Kimberley Reins, which cited for other purposes, is very specific in that it allows parties where some are going to expressly exclude certain claims. They're not expressly excluding. That's my problem in the Superior Court. All we know is the district court dismissed all claims with prejudice. Well, the question is, as a sister court, what value are you going to give to that order if CBS never raises that, and in fact concedes, and they do concede, that the claims were specific to the carve-out? This was raised by the other plaintiffs. My question is, how did we even get to the carve-out? Because in the Superior Court order, all it says is that all claims are dismissed with prejudice. Yes. And my position, Your Honor, is that Kimberley Reins would allow you to do so, in the express language of the California Supreme Court, that allows that, that allows the parties to do that. But you say that we can reference, you know, confidential settlements in the supplemental briefing and decide standing based off of that. You mean that this language is included, but it's in your brief. It's not even evidence. Well, to the extent that this is, we did not think this was an issue. I mean, simply because. CBS doesn't think it's an issue. CBS doesn't think it's an issue. The only people who think it's an issue are the people who have attacked us. The question is, there's an unqualified dismissal from the State Superior Court. Do you want to speak to that? Is there an answer, Kim? Or is your answer, what is your answer? Well, there are two points on this. The first is that the only possibility for us to dismiss our claims after certification has happened, and there's a final order, and this is not certain precedent, is through the process of the class certification process. So, in other words, it seems to me what you're arguing is because she hadn't talked about the State Superior Court when we talked about dismissals. His claim was she was in. Yes, she's in. And, by the way, I want to address this, because it goes to the church role. Wait, I'm sorry. I don't understand. So, a plaintiff can't voluntarily dismiss her claims in settlement if another class action is going on? No, no, no. The point is, is that once there has been final approval, the only person who could dismiss that claim would be the court granting the final approval, and that's the Ninth Circuit precedent, and we cite the Payne-Weber Limited Partnership case in the supplemental brief. But if she had no standing at that point, what if she settled all her claims? Why does it matter what the district court can do? If the person had no claims left in the class action, it doesn't matter. The settlement that occurred, and, by the way, I do forget that I didn't ask to reserve time. No, I didn't do that. It doesn't matter. It's up to you. Just watch the clock. I'll watch the clock, but I'll say four minutes, though, just to put a pin on that. Okay. So, Your Honor, I do appreciate your argument, but the issue is this, okay? Let's go through the timeline. The timeline is, first, Ms. Gassanian objects. Second, the final order of the court is, you know, is granting class certification. And then, only then, after that, there is this dismissal in the Superior Court with the express carve-out. So, to the extent that this court in the Ninth Circuit wants to grant, you know, try to give some precedent to the Superior Court of Orange County's dismissal, what we would say is that that dismissal is not effective because the trial court, the district court, that granted final class certification is the only, has the only, has full jurisdiction of these claims because Ms. Gassanian was specifically objective in being a member of the class. She did not opt out. Not opt out. Yes, and that's the crucial thing. I would just argue that if you settle your claims, your case is mooted, instead of the district court's authority is mooted. That's the purpose of reviewing the timeline. Well, yes, because I think that, you know, perhaps, Your Honor, that argument may have more sway if the dismissal of the Orange County Superior Court case happened prior to certification, final certification. But, I mean, I think you have to maintain your standing throughout the whole litigation. I guess my problem is if we didn't have your supplemental briefing, all we would have is the Superior Court order dismissing all claims with prejudice. To me, that seems that would extinguish all your client's claims. Well, the argument, well, I appreciate it, Your Honor, and that's going to be the ruling that you would like to maintain. I, of course, respect that. What I would argue, though, is there are very good reasons why that should not be the order of this court. And what we say is, particularly to the Federal Circuit Court analysis that we decide in the Payne-Weber case about how they thought that the Orange County Superior Court could not have jurisdiction over those claims. Once the final order was issued as to granting class certification. So that order has no effect as to these claims. It cannot have effect because that is the law of this circuit. I completely understand that. Okay. I will not belabor it. Now, any further? I'm fine. Okay. Let me go to what I think is the lowest hanging fruit, and that's notice. Okay. And I know that we want to get to the substantive issues, and I will get to that in a minute. I have a question for you about notice. Sure, go ahead. Thank you. You thought there should have been an e-mail notice and not just U.S. Postal Service mail notice. Yes, that's correct, Your Honor. Is there any Ninth Circuit case or any other case that so holds? No. Not that we were able to find, Your Honor. What we did find, however, and I will say this, is that My thought when I read that argument was, gee, you don't have a lot of returned letters, less than 1%, and you don't have a precedent saying that e-mail notice is needed. Where does this come from? Why? What prejudice has been shown? And this seems like just a nice new idea. Well, what we would maintain, Your Honor, is that Federal Rule Procedure 23C2B requires the best practical notice, or more specifically, to cite the best notice that is practical under most circumstances. I don't really know what's best practical. I mean, all of us, I imagine, get so much junk in our e-mail that we occasionally miss something that's in our e-mail. Why is it better than all the junk mail causing us to miss something significant in our snail mail? Well, Your Honor, the point is that the district court did do that analysis. Okay. Doesn't opposing counsel make the representation that they didn't have the e-mail for? I'm not aware of that, Your Honor. But the issue is this. The issue is that the district court did not do an analysis of why e-mail would have not, if you did include e-mail, why e-mail was not included, or other means. Okay? I do respect if that's the case. It's a type argument. But, okay. Okay. But I do think the issue, though, is very simple, though. What is the best practical notice? You know, in the 19th century, horse and buggy was the best practical notice. You don't have all the e-mails, and you're talking about a class period that extends back for some period of time. Is this difficult? Yes. But maybe if you don't have all the addresses that are accurate. I mean, the issue of the .5 percent. They had a very low return rate. Yes, but the idea is assuming that the Postal Service is doing its job and sending returns. That's an assumption that's being made entirely. You're engaging in speculation at this point, or it seems to me that you're asking us to do so. And I think your point is pretty. It all folds up into your main point, it seems to me, which is that you think that the district court didn't inquire sufficiently or didn't do what the rule requires. That's a fair summary of my point, Your Honor. And I think that that, to the extent the court accepts that, I appreciate that. To the extent the court is skeptical of that, that is an issue. What I will raise with the court, however, is that in our brief, in our reply brief, we cite 20 cases where e-mail notice was required of class certification. And since the reply brief, there are 19 additional district court cases in class action certification where e-mail notice was required. Right, I appreciate that, and I can imagine circumstances where the district court would do that. But it really just all comes back to Judge Leinfeld's first question. I don't think we've ever said that that has to be the case here. It's according to the rule what's best. No, but what should be the case is. I would think in a lot of cases that would come to the district court, it would be the lawyers in the class action who would prefer the e-mail notice because it's cheap. Right. Free. You don't have to pay for a stamp. And the stamps and the stationery add up. I was surprised to see it, frankly. I was quite surprised to see it. It's just that I don't see why is this error. What's your strongest argument this was an error? First of all, we're arguing that it should be supplemental, not alone. That it be supplementing to e-mail notice. The strongest argument is that best practical notice requires the court to consider different options that were not done by the district court. Okay. Let me move on and then to the, I think, which has been alluded to earlier. And I want to raise a point that CVS counsel raised in another case. And CVS counsel said that the creation of arbitral forms that were done by CVS means that the lower value of this case is justified. I'm paraphrasing, perhaps. But the reason why that is, I cannot say this other than this is a cynical argument. CVS creates a mandatory arbitration policy. And then says, well, you know what, that justifies $286 per litigant or per class member in terms of resolution. I've never understood why the arbitration has any bearing on whether the settlement is collusive or whether it's adequate and fair and reasonable. Cases get resolved by jury trials and cases get resolved by arbitration. And both cases, when the plaintiff has a good case, they get money. Yes. And I've actually seen plenty where they got more in arbitration than they probably would have gotten in litigation. Yes. The point I'm trying to make, Your Honor, and I do appreciate your analysis and understanding of arbitration, is that the low value of the settlement should be cast for suspicion as to whether it's fair and reasonable and adequate. That is the issue. And we are just not asking about that. And that makes sense to me. What doesn't make sense to me is treating cases that go to arbitration as having zero value. And I appreciate and I agree, Your Honor. I agree 100% on that. So I think that's the problem with it. That's part of the problem with CVS's analysis. And, you know, if I may, I provided to the district court a detailed declaration as to the lack of analysis in terms of the by-plans counsel as to the actual merits or substantive issues of the case. And what I did is I looked through, first of all, I looked through the attorney fee records, which I said, and I noted that the best I could find was that Mr. Morrison, the lead counsel, spent approximately eight hours of analysis. And that's at paragraph 44 of my declaration, which is at 2318. That seems to indicate that there was not a careful analysis that's necessary to be able to settle a $10 million case with 25,000 class members. Eight hours. There was not a single deposition that was taken in this case. By any of the groups of different plaintiff attorneys. The analysis, and it was even further, it was further startling when I looked through the cost, excuse me, and the cost analysis was even more troubling. Because in the cost analysis, there was expenses of $6,820.12 by Mr. Morrison, of which only $2,500 were litigation costs related to the case. As best I could tell, there were only $4,000 in litigation costs related to the actual analysis by an expert. So if you're dealing with thousands of pages of analysis, thousands of pages a page in a waging hour, you know, timesheets or data sheets. How much did their experts say the case was worth? As you noted, Your Honor, I believe it was approximately, that was a 2% or 3% of the final settlement. So it was in the tens of millions of dollars. I remember two valuations in the neighborhood of $150 million and one that seems like it was $207 million. And the case settled for $10 million. Yes, but I want to check and make sure my recollection is right. I believe you're correct, Your Honor. And the point of that, so I guess what I'm trying to make, I'm trying to make two points on this. And perhaps the distinction is a little bit subtle. But the first is that there isn't even a fair enough analysis by plaintiff's counsel to be able to adequately value this case. In the sense of, if you look through their time records, if you look through the cost bill, there isn't substantive analysis of the actual case. The vast majority of the time, the majority of time that was spent by counsel was spent actually approving a class settlement. And all the litigation that's resulted because of objectors or belayers or attempts to intervene. The second, though, is this. So the litigation wasn't really underpaid pharmacists and pharmacy techs versus CVS. The litigation was CVS and the underpaid pharmacists getting together on how do we sell this deal to the court, except it really is the lawyer for the underpaid pharmacists. Your Honor. Have I got that right? Yes. And there's no better example of that than if you look at who's seated at that table. They're all seated together. And I know it's perhaps a metaphor. It's a metaphor. Oh, he isn't. He doesn't have three tables. But it is a metaphor, Your Honor.  Okay. With that, I will reserve. Okay. Thank you, Your Honor. Your Honor, I'm just going to address a few issues and then turn it over to my co-counsel. This understanding issue, I think, is very significant, and I think your questions are prescient. Of course, when they went to the lower court and settled the case, all causes of action, dismissed all causes of action with prejudice. There's a form, and the form says, are there any, or is there anything other than these causes of action that has not been settled? They check the box. No, there's not. What court are you talking about? I'm talking about the district court, Your Honor. When they went to the district court and settled it. Oh, you're not talking about the superior court? No, you're talking about the superior court. You know the difference? The federal district court, the state superior court. Oh, yes, yes, yes. I apologize. Of course I do, Your Honor. Of course I do. Yes, the superior court. Okay. Where is this in the excerpt? Check the box for the same. I can have, let me get that for you. Yes, they told the state superior court there are no carve-outs, and they're telling us there is a carve-out. Correct. We'd really like to have the case. Are you arguing beyond the record? No, absolutely not. I believe it is in the record, Your Honor. And we'll make sure of that. And we'll make sure of that right now. I see this order. It is all about checking boxes. Yes, it is. I can't believe that that's how you settle a case. When you're talking to a couple of former trial court judges, and it's unusual for a trial court judge to push back very hard when parties show up, will the stipulation tell us that they're settling the case? Absolutely. We don't know. Right? Absolutely. It would be atypical if the settlement agreement was filed in the superior court. Yes, but the form that they filled out said that they were dismissing the entire case with prejudice within a carve-out. This doesn't make this argument in the briefing doesn't contest the scope of that, that there was a carve-out. Well, Your Honor, as you are all aware, I believe, from the record from the briefings, we were unaware. And still to this day, we are unaware. We've never seen this settlement agreement that they have that has carve-outs. And as a matter of fact, I don't believe it is properly before this court. It was never submitted as evidence. Counsel, I don't want you to waste your time, but we did request supplemental briefing because there's this sort of fly-by mention of it, and we wanted to know do we have standing or not, do we have jurisdiction or not. And so here we are today. Could you speak, because opposing counsel, we sort of tortured him, going through the timeline of the sequence of events regarding certification and the notice of settlement. Could you respond to his argument? I'm not sure. There could have been a release of this claim. I'm aware of the case that he is talking about. And it is, I guess what the theory is, is that because they did not opt out of the settlement, the causes of action that are at issue here, they didn't essentially have the right to settle. I understand that that's what it says. But again, when they dismiss the entire case with prejudice, they're taking a different position in a lower court than they then take here. I mean it's kind of a classic. They didn't dismiss without prejudice in the lower court, in the district court. They did that in the superior court. Yes, sir. And if California law says carve-outs in the settlement agreement are good, they stand, that should be the end of that particular argument that you're making. I understand, Your Honor. And that, again, that is not, you know, our position is that they dismiss the entire case with prejudice, that they withheld that information from the trial. Well, what a dismissal with prejudice means can sometimes depend on the settlement agreement. I mean sometimes it just means whatever claims are in the complaint are dismissed, and sometimes it can mean all claims are dismissed, and sometimes it can mean that according to our settlement agreement, we just don't want to litigate this case anymore in the state superior court, but our claims are not barred. Well, all the claims were dismissed with prejudice, and all the claims were in that complaint. Does that mean in California law that they can't be brought at all anywhere? Absolutely. That means only that they can't be brought in the state court system again? No, they can't be brought anywhere. That's judicial estoppel. I mean it's the old concept of judicial estoppel, which is now considered to be. . . That's not judicial estoppel, it's res judicata. Yes, the res judicata is the modern. . . Yes, you're right. Taking advantage of a statement that you made in court that you gained some benefit from. . . Absolutely, and the benefit that they gained was that they resolved the underlying action and were paid to resolve the underlying action. As I was saying, the claim that they make that they carved those out with the settlement agreement, we've never seen the settlement agreement. This court's never seen the settlement agreement. Delaware court never saw the settlement agreement. So that's my question. Did they ever show that to the superior court? Never showed it to anyone. It is not in evidence anywhere. I've never seen a case when I was a trial judge where anyone showed me the settlement agreement, and for that matter when I was a lawyer doing settlement agreements on both sides, I never had a case where we submitted it to the court or the court's business. I agree. I don't litigate. I agree, Your Honor, but in those cases where you were involved in those settlements or were involved as a judge or was involved as a lawyer, if there was a carve out, if you were keeping some causes of action to continue to litigate, then that, even whether or not you presented the settlement agreement, you would have made the court aware of those carve outs. Otherwise, it is res judicata because you would have dismissed all the claims with prejudice. It would definitely be the case that it would be clearer if the parties presented that carve out in the order to the superior court. That did not happen here, correct? It did not. So I guess the problem is we just have to take the party's word that there's a secret carve out. Again, yes, with no evidence. It's uncontested. CBS doesn't contest that there's this carve out. You're correct. Right? Are you familiar with our Nowruz decision? Pardon me? Are you familiar with our Nowruz decision? I don't believe so. Okay. I don't believe so. I don't believe so. And Sally is going to give us the page number for where there's an outline. Again, I'm sure that it's being reviewed. Okay, as long as somebody does. Okay, that's all I wanted to address. I just want to address the fairness of the settlement, which I think has been a concern of the court. And first I'm going to talk about the investigative efforts. We interviewed over 100 class members. We reviewed all the relevant policies and procedures. We got the pay records through formal discovery. We looked at their computer records off the clock time and compared it to the pay records. We spent a ton of time litigating this case, and collectively the hours were so that it's a misrepresentation to say this case was not investigated. But let's talk about the fairness of it. I understand it seems like a low amount, but it's also. That's $10 million compared to your own experts saying it's worth, what, $256 million. So those are the expert numbers that we use for mediation to try to get the best deal possible. But it doesn't take into account certification. It did pretty well for the plaintiffs. And the other experts. I mean, you've got three experts, and they're all in the hundreds of millions, and you settle for $10 million with two and a half going to the lawyers. So the class gets settlements. It's not worth it for a class member to fill in all the forms and dig out his old employment records to get his piddling amount of money. So let me address that. How much is a case worth where you believe you're going to have a different time prevailing? There were serious merits issues. It looks like there weren't any serious merits issues. Let me address that. I'll go through each of the claims if you'll give me a second. First of all, the rest period. Their entire theory is that there was a geographic restriction whether or not they could leave the store. The California Supreme Court has already indicated in Augustus v. IBM. That's your strongest. Okay, so that's one. So that takes up like a couple hundred million dollars of the claim. Let's look at the solar pharmacists. We spoke with a bunch of solar pharmacists. Some of them left the store. Some of them took a break whenever they wanted. CVS has defeated two statewide certification class actions in the last 10 years that we pointed out. One of them involved one of our co-counsel in the case. So what's going to happen is CVS is going to put all these happy camper declarations that say, I can take my meal and rest periods. I don't work off the clock. And we're going to have our declarations. And you look at the violation rate for meal periods. Remember, we're certifying the whole class. Their answer was at 3.3%. We said 4.8%. I have never seen a case certified with those numbers. We had a tough job before us. Off the clock cases, look at all the cases we have noted with the same sort of theory about opening and closing activities where a court has declined to certify a class. In fact, the reason why Chalian started. I don't really understand why they're. It seems like just a model for why the class action rule was created in the first place. A large number of people with similar claims that are likely to be too small to litigate. Correct. And that's exactly. Claims don't seem to differ at all. Well, but Sandy devalued her claim at six figures. Okay. And if that was the case, you should have opted out. We did not see those. I'm not going to talk about that. Okay. People seem to want to talk about standing until they're blue in the face, and I'm more concerned about right to appeal. Right. So in this case, it seems I am concerned that there was an attempt by DeSemian to intervene that was denied, and that was not appealed. Right? Correct. And she didn't opt out. Correct. So I'm trying to figure out why we should be, under our Churchill case, why she should be allowed to go forward with the appeal. I don't believe she should be allowed to go forward with the appeal for the reasons that you stated. I was addressing a different issue. The issue was, what is this case worth? Right. In the process of doing so, though, you were agreeing that this case is not worth very much money. And we were talking about what class actions we are. Right. And that seems to be quite different. I don't know where she gets those numbers, right, because every one of the policies at issue here is facially valid. So you're going to have to demonstrate. If you're going to argue that your claim isn't worth very much, then you're going to talk yourself into a Churchill exception for certain circumstances because she couldn't otherwise protect her rights. Yeah. It seems to me she's trying to take advantage of an exception. Correct. That is set up for a very different circumstance. And I was speaking more holistically about this element. If, for her perspective, our case, you're correct. I agree. That's what I'm trying to do. Yeah. And I don't disagree with that. I don't think it's a question of standing. I think we've said as much in Churchill. It's a question of right to appeal. Correct. And that's not what I'm arguing. I want to, again, defend our efforts on this case because there seems to be some sort of assumption on their part that we've investigated fully. We had experience. The people on our class side actually litigated these cases against CBS and lost. When we split up, the challenge case was the first case that started. We did two legions because we were very concerned about class certification issues. Along the way, we found another case that had a much broader class, and we worked collectively with them. But, frankly, looking at the facially valid policies, and over the years, those policies have gotten better. In the middle of our case, for example, they explicitly said that a fellow pharmacist can take a meal period, whereas before the only policy said was that you may be prevented from doing so. And if you did, tell them and they'll pay you. So it's going to be very individualized issues to determine why someone or if they did ask to be paid for that time and whether or not CBS did or did not pay them. And, again, we're looking at an overall meal period violation rate of either 3.3% or 4.8%. So what is a case... A person may have to ask. I don't understand. A person has to look their face up and go to personnel and say you made a mistake? What I'm saying is that CBS's policy in the circumstance where they were told, hey, today you couldn't, you're a sole pharmacist, you may have been prevented from taking a meal period, we'll pay you from the time if you indicate today you couldn't take a meal period. In other words, it envisions a scenario where sole pharmacists did, in fact, when they were working alone, take meal periods, right, because the store might not be busy that day. There are tons of cases out there where the theory is the volume of the store dictates whether or not someone can take a break. And courts after courts have said those are inherently individualized issues. I have lost on those issues time after time again with low violation rates like that. I guess what you're saying is you really didn't have to do that much work in this case because you already knew a lot about this sort of case. Well, we did 100 class members to interview. It's not insignificant. And when you have a sample size of 100 class members and they tell you different things in terms of their experiences, that's an issue. You don't get $2.5 million just for talking to 100 people. We did more than that. We reviewed the past cases, and other cases were certification but denied by CBS. We got some of the depositions in those cases and read the testimony. We read what Himes did in their motion to cause certification. I read the declarations that were submitted in that case. We, again, looked at the relevant policies and procedures at issue. We read all of them. We attached a lot of them to our final approval papers, and they're actually part of the record about what their policies were for rest periods, for meal periods. We looked at the case law in this area. For example, the Bell v. Home Depot case, the Augustus v. IBM case on rest periods. And remember, most of the damages on this huge figure is from the meal and rest periods, which we didn't think were certifiable. So what we're trying to do is use the maximum leverage possible in these two cases to get as much as possible for the class for claims that we thought were very, very difficult. And the trial court judge, remember this district court judge, this is an abusive discretion standard. It recognized that. It recognized the real merits issues and certification issues in these cases. That was not abusive discretion on the case court. And in terms of I didn't provide any analysis below, there was 17 pages in the final approval order where I walked through every single claim, and I urge the court to do that as well when we provide our analysis and understanding of the facts on the ground and the case law in that area and why it was going to be difficult. I'd like to leave my arrest time for Mr. Rudrow. You're the page number guy, right? May it please the court. It was docket number 26 on the appeal. It was the appellate docket 26 where the court took judicial notice of that order. So you know. Just to touch briefly, of course. What I wanted to do was look at the form where they checked the box saying no carve-outs. There is exactly that. Why didn't you check the box of carve-outs? I didn't. Well, no, it had nothing to do with the case. Well, I mean the parties. Why didn't you? It would have been just clearer that there was carve-outs to the, because that says all claims with prejudice. I don't understand why there was no box checked. I don't disagree with you. I don't understand either. Incidentally, do you have an ER number? No, I do not. Because I always look at the excerpts. It was not part of the excerpts because it was part of the supplemental briefing. Right. But CVS was part of that lower court litigation. CVS was part of it but didn't file the dismissal paperwork. The plaintiff did. So Mr. Hennig, you can presume that we have the answer then. Right. Are you familiar with our Nowruz case? I am not, Your Honor. Okay. But it's just because you don't disagree with you. There's no dispute that there's this confidential agreement that carves out Ms. Gesselman's ability to pursue this litigation. Correct. There is a carve out that allowed her to participate in this case. What impact that had, it literally says, if any. So it's up to the court to decide. And I agree it's not an issue of appellate standing. I do agree there is an issue of Churchill and whether there is a right to appeal here. Because ultimately, she was pursuing her own individual case. She values it at $118,000. She gets a notice in the mail that says $896. Voluntarily decides to take that opt-in. There's a consent to the judgment, for lack of a better term. And typically, parties who consent to judgments can't appeal them. So I do think that there is an issue as to whether there is a right to an appeal here. And that is briefed in that supplemental briefing. Hold on. Are you saying she took the $800 and she signed some form saying she consented to the judgment? Well, by opting. By not opting. By opting out of the case, she knew that she was going to be bound. She got the notice, chose to participate in the case, not opt out. Can you object without opting out? Yes, you can object, which is what she did. Right. And the closing counsel is going to come up to the podium in a minute, and he's going to say, well, we hear appeals from objectors. So do you want to speak to that? Because you're not going to get another chance. You do hear appeals from objectors. And one other, I want to go to the actual merits of the appeal. And the first is the fact on the e-mail notice. And I want you to know the district judge did address that clearly in his order at page 14, why not e-mail notice, and that mail was sufficient. Second, I just want to wrap up totally with respect to the job. This was a hotly contested case. I think you're missing the point. I asked you to invite you to speak to it. I said he's going to get back up. I just indicated not very subtly why I'm concerned about it. Does Ms. Kasemian have a right to appeal? And it indicated that I think she's dissimilarly situated from Churchill, where the exception has been allowed because she didn't opt out and she values her claim. Correct. And she didn't appeal the notice of the unfavorable ruling on her motion to intervene. Correct. And I said he's going to get up and he's going to say, yes, but you hear appeals from objectors all the time. So why shouldn't we allow her to go forward? Because the purpose of Churchill, remember that it was the exception to the appeal rule, that a party can't appeal, objectors aren't colleagues. That's really what Churchill was trying to get you to address it. Right. Was that the claims were so small that it was a practical inability that they were in everybody's faces. That's why I think she may not qualify for the exception counsel, but we hear appeals from objectors. So she didn't appeal the intervention, right, but she did object to the settlement, and we hear appeals from objectors. Why should she not be allowed to appeal the approval of the settlement? Because she's not a party that is subject to it. And I understand the carve out for the objector is because there is a practical inability to pursue the claim because of the small dollar value. That is that they're not going to be pursued as a whole. That's the premise of my question. Here that is not the case. She had her claim that she says is worth $118,000. Then with full knowledge of $850 or whatever it was the notice told her, she decides I'm going to consent and participate rather than pursue my individual claim. I'm going to drop them. And that she doesn't need. What if she had just objected? She would probably in all likelihood have the right to appeal because you would be subject to the same argument that, you know, these aren't small dollar claims that qualify for the judgment. What you're saying is that no objector can be allowed to appeal the fairness of the settlement in a class action if their own interest is big enough so they might be able to hire a lawyer. That's right. If you follow the bailout. That's a rule I've never seen a citation for. That's there. Well, I mean, I think that's definitely. Is there a case that says no one can object to a class action settlement if their claims are large? I don't think it's that you can't object. The question is do you have the quote-unquote right to appeal? Okay. Is there a case that says you have no right to appeal the class action settlement if your claims are large? That is what Churchill arguably stands for. I don't think Churchill says that. Churchill says because the claims are so small, there is no practical ability that you would be able to preserve your rights. It's an extension of Devlin. And the concern with Devlin was these folks don't have any other avenue. And his premise is that if the claim is worth six figures, then maybe there was another avenue. But my question really is if she had not sought intervention, and I'm more worried about an end run around the intervention ruling, would she be allowed to appeal having been an objector? We would be arguing over the size of the claim and whether that qualifies as sufficient in and of itself to qualify for the Churchill exception. You know, just because Churchill and Devlin focused on there not being enough money to justify going outside it, I don't know if I can see a negative pregnant there that if there is enough money, then you can't appeal. I mean, if you say when you go to the grocery, get a quart of milk and a quart of ice cream, it doesn't have a negative pregnant that you may not get a box of cookies? I think it has to do with the appellate rules of civil procedure, which limit the ability to appeal to parties. Counsel, we've taken you over time. Could you wrap up, please? Certainly. I really do just want to hit on the Rule 23 components. And I know that you have all read the district court's order here, finally approving the settlement. It was a hotly contested piece of litigation. It went on for a very long time. The amount of diligence that Judge Barrett spent reviewing the settlement, every single argument that has been made to this court, thousands of pages. It was the extensive litigation. It looked like there was a lot of private negotiation. I'm not sure there was such extensive litigation. Well, there was a lot of procedural litigation, a lot. Motion to practice, motions to dismiss, efforts to limit the classes, efforts to dismiss the cases. It was significant. Judge Barrett, I mean, that's why we ended up in mediation, frankly. I mean, Judge Barrett, we were there pursuant to his order. But it was a hotly contested case, and the settlement was challenged ad nauseum by the objectors. And, frankly, he exercised an incredible amount of patience. He listened to each and every single word that was said, read every paper. Most of the litigation was actually with the objectors rather than before that. I don't think you ever certified a class, for example, and I wonder if anything can be said to be late in the game if it's pre-certification. Well, the pre-certification has special approval standards. It's not unusual to settle a case pre-certification at all. Then you need to apply class actions where the first thing that happens is certification. Certainly there are, but the norm, particularly in employment cases, is not that. And, you know, there are factors that he had to run through. He ran through each of the Bluetooth factors, you know, to test whether there were any indicia of collusion and whatnot. Bluetooth says that pre-certification settlement is itself an indication of collusion. That's exactly why there are factors that the court must go through, and he did every one of them. And nobody challenges that the district court complied with the legal standards. Everybody agrees he complied with the legal standards. They're contesting his resolution of the objections, and all he needs to do is give a reasoned response to every objection, and, you know, he's entitled to the discretion. You sit somewhat in a court of limited review here because of the standard, and there is nothing that he did not address and did not lay out in his order that which in any way, shape, or form show that this ultimate resolution was not fair and in the best interest of the class, ultimately. Thank you. Thank you so much. I'm concerned about the right to appeal. I noticed. I'm not so. So let's just. Churchill Downs did establish a bright light rule, Your Honor. I mean, it did say that objectors have the right to appeal. Now, it gave analysis for that reason, and that's because of the low valuation typically associated with that. But it did give a bright line rule. Well, you start from the premise that non-parties can't appeal. That's the premise? Yes, yes. Okay. And then we have Devlin, and then we had Churchill. Yes. So you have an exception to the bright line rule. All those exceptions are about, and there's two of them. They're pretty narrow. Yes. And they really are concerned with folks who wouldn't have another avenue. And, and, and. Okay. Sure, sure. And, excuse me, your client had a couple of them. Sure. What do I do about the fact that her claim she did not value at a low number? And I mean post, post-Superior Court. My understanding is that there's representation in the record. I have the ER site somewhere. I would have a lot of ER sites and sticky notes for this case. About 100, I thought it was 113 a minute ago. Somebody said 118. Sure. The price tag that she put on it, understanding those are really rough post-settlement in the Superior Court. Do I have that wrong? No, Your Honor. I mean, you know what? I always find that candor's important. So let me just be candid. And I think you are absolutely right. If you want to interpret Churchill as saying that the reason why Meade-Dulao appeals is because of the lack of other avenues, I think that that would be an issue here, obviously, for Mns. Gusevian. But the reason why Mns. Gusevian should not be subject to that is because Churchill, we believe, established this rule that was more or less a bright line, whatever the reasoning for it, that objectors do have the right to appeal and do have standing before this Ninth Circuit. So that is why. So can I just press back on that? Sure. That subset, that universe of objectors are people who are part of a class action. And class actions typically we think of as, by definition, claims too small to be litigated individually. So why am I wrong if we conceptualize it this way? Well, okay, the problem with it is that what rule are you going to create then? And I just say on a practical level, if you don't have a bright line rule, and the bright line rule is that objectors to a class action, either a B1 or a B3, have the ability to appeal and have standing before this court, then what's the rule you're going to set? You're going to do an analysis with every single case. Now, you can do that here perhaps, but then it becomes unworkable for this court to do that in every other class action. I think what you're telling me, if I were to do that, I would be making new law. Is that right? Well, you're going to create an exception to the exception to the exception. Right. And I'd be creating new law. Yes, you'll be creating new law. So your position is that it would be, right? Yes, absolutely. And then the question is, how do you administer it? Like, what's the valuation that's the cutoff between the standing subject and what's not? Let me just say this. Ms. Gissemian voluntarily decided to be an objector. I mean, this is not my case. This is Ms. Gissemian's case. And she did that because of the reason that she believed that her colleagues were being unfairly given a settlement that was worth so far less than the value of it. And she didn't opt out for that reason. And she didn't opt out because she wanted to do this. And, you know, I think we should reward, in a certain sense, her altruism because that's exactly what it is. And as you said, I want to make sure there's a lot of players here. Yes. And I think what you're saying is that she thought it was really a raw deal for her colleagues, for her colleagues, and so she didn't opt out so that she could object. That's exactly right. Okay. Let me just make two last points. And you're saying them over time, and I don't want to. And you've been very good about enforcing it to others. The idea that 100 class members were interviewed, that comes from the declaration of Tom Falvey. And it's very clear from the attorney fee records, both in terms of the time and also in terms of the cost, that those 100 people actually relates to prior cases, not this case. And I just want to be very clear. I have reviewed this very carefully. And it's very carefully stated in Mr. Falvey's declaration that he has interviewed 100 CVS workers, but not to this case because there's no time records that establish that he interviewed the folks in this case. So I think that is highly problematic to say because we are experts around CVS and we have sold CVS cases out in terms of, and by the way, the violations keep continuing, keep continuing, keep continuing, that they are not the attorneys that should be, you know, coming up here and saying there's a fair settlement for the class members if the violations continue. And that was the point raised by my colleagues in the prior case. The idea, so we go to the time records for a reason. Because whatever they say in their declaration of how careful they analyze, let's look at the time they spent. We go to the cost records for a reason. Because however much they say, we analyze this thing, we send it to our expert. And again, undisputed that they spent approximately 10 to 15 hours for the expert to analyze, for analysis. And undisputed that Mr. Morrison only spent eight hours of his own analysis on the substantive analysis of these claims. Thank you, Your Honors. Any questions? Okay, I think we're done. We're just going to take a quick break. We'll be back in about 10 minutes. Thank you. All rise.
judges: KLEINFELD, CHRISTEN, BUMATAY